## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | |
|---|---|
| Jockey International, Inc., | |
| *Plaintiff,* | |
| v. | Case No. _____ |
| Lamont D. Cooper and Black Jockey Company, | |
| *Defendants*. | |

## COMPLAINT

Plaintiff, Jockey International, Inc. ("Jockey"), for its Complaint against Defendants, Lamont D. Cooper ("Cooper") and Black Jockey Company ("BJC"), hereby states and alleges as follows:

### NATURE OF THE CASE

1.      This is an action under Section 21(b)(1) of the Lanham Act, 15 U.S.C. 1071(b)(1), seeking *de novo* judicial review of a final decision of the Trademark Trial and Appeal Board ("TTAB"), an administrative agency of the United States Patent and Trademark Office ("USPTO"), and claims for trademark infringement pursuant to Lanham Act § 32(1), 15 U.S.C. § 1114(1) against Defendants.

## THE PARTIES

2.      Jockey is a Wisconsin corporation with its principal place of business at 2300 60th Street, Kenosha, Wisconsin 53140.

3.      Cooper is an individual who, upon information and belief, resides at 862 Heritage Post Lane, Grayson, Georgia 30017.

4.      BJC is a Georgia company with a principal place of business located at 1911 Grayson Hwy 8-130, Grayson, Georgia 30017.

## JURISDICTION AND VENUE

5.      This action seeks review and reversal of a decision of the TTAB of the USPTO. This action arises under the laws of the United States, 15 U.S.C. § 1071(b).

6.      This action also brings claims related to the allegations at issue in the TTAB decision and asserts claims for trademark infringement pursuant to Lanham Act § 32(1), 15 U.S.C. § 1114(1) against Defendants for their use of certain marks, including marks addressed in the TTAB decision.

7.      Therefore, this Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1338(a), and 1367(a).

8.      This Court has personal jurisdiction over Cooper because Cooper has regularly solicited business or derived substantial revenue from goods promoted,

advertised, sold, used, and/or consumed within this District and expects his actions to have consequences in this District. Upon information and belief, Cooper resides within this District. This Court has personal jurisdiction over BJC because it has regularly solicited business or derived a substantial revenue from goods promoted, advertised, sold, used, and/or consumed within this District and expects its actions to have consequences in this District. BJC's principal place of business is within this District.

9.     Venue in this District is proper under 28 U.S.C. § 1391(b) because Cooper and BJC regularly transact business within this District.

## FACTUAL BACKGROUND

10.     Jockey is one of the world's most beloved and recognized apparel brands. It has a long history of cutting-edge innovations in the garment industry, most famously for its revolutionary invention of the world's first men's underwear brief in 1934 – the "JOCKEY short". From humble, entrepreneurial beginnings in men's hosiery and underwear, Jockey today has expanded into a global force in the apparel industry, carrying the mission of "satisfying the human need for comfort" in over 140 countries with a full range of apparel items.

11.     Since at least as early as 1934, Jockey and its predecessors-in-interest have continuously used the famous mark JOCKEY in U.S. commerce in

connection with the promotion and sale of apparel items together with related goods and services such as retail store services.

12.    In 1940, Jockey introduced its "Jockey Figure" mark, a pictorial



representation of the figure of a jockey:  . Since then, Jockey and its predecessors-in-interest have continuously used a Jockey Figure and related marks that either: (a) comprise or contain a visual representation of the figure of a jockey, either in full body design or half body design; or (b) comprise or contain the word "JOCKEY." Jockey and its predecessors-in-interest have used these marks in connection with the promotion and sale of a large variety of apparel goods including, but not limited to, sweatshirts, sweaters, shirts of various types, jackets, underwear tops and bottoms, activewear, athleisurewear, and socks, as well as related goods and services such as retail store services.

13.    Jockey owns the following figure and word marks:

| Mark | Reg./App. No. | Reg./App. Date | Date of First Use | Goods/Services |
|---|---|---|---|---|
| <br>(the "1960s Half Jockey Mark") | 0711570* | Feb. 21, 1961 | Mar. 29, 1960 | Wearing apparel for men, women, and children-, namely, underwear for men and boys, [hosiery for men, women, and children,] sweaters, sweat shirts, sport shirts [,and sport shorts] |
| <br>(the "1960s Full Jockey Mark") | 0768840* | Apr. 28, 1964 | Sept. 30, 1960 | [Wearing apparel for men, women and children- namely, underwear for men and boys, hosiery for men, women and children, sweaters, sweat shirts, sport shirts and sport shorts]* wearing apparel for men; namely, sport shirts* |

| Mark | Reg./App. No. | Reg./App. Date | Date of First Use | Goods/Services |
|---|---|---|---|---|
|   (the "2011 Full Jockey Mark") | 4471345* | Jan. 21, 2014 | Jun. 30, 2012 | Underwear tops and bottoms; panties; camisoles; tanks; bras; socks; hosiery; long underwear; activewear, namely, tops and bottoms, bras, tanks, t-shirts, pants, shorts and jackets; sportswear, namely, tops and bottoms, bras, tanks, t-shirts, pants, shorts and jackets; sleepwear; shapewear, namely, tops and bottoms, [tanks,] camisoles; [slips and bodysuits;] and thermal underwear tops and bottoms |
|   (the "2011 Composite Jockey Mark") | 4641620 | Nov. 18, 2014 | Dec. 31, 2013 | Underwear |

| Mark | Reg./App. No. | Reg./App. Date | Date of First Use | Goods/Services |
|---|---|---|---|---|
| <br>(the "JOCKEY Seal") | 5984914 | Feb. 11, 2020 | Dec. 31, 2018 | Underwear; undergarments, namely, camisoles, bras, bralettes; socks; hosiery; activewear, sportswear, and athleisurewear, namely, tops and bottoms, sports bras, tank tops, t-shirts, shirts, sweatshirts, vests, pants, shorts, skorts, leggings, sweaters, and jackets; loungewear; sleepwear |
| JOCKEY | 0391692* | Nov. 18, 1941 | Nov. 23, 1934 | Underwear, such as men's and boys' undershirts, underdrawers, both with and without legs, as well as [drawers having an abdominal supporting band, union suits and] hosiery |

| Mark | Reg./App. No. | Reg./App. Date | Date of First Use | Goods/Services |
|---|---|---|---|---|
| JOCKEY | 0509364* | May 03, 1949 | Aug. 17, 1934 | Men's and Boy's Underwear, Undershirts, [Union Suits,] Hosiery, [Swim Trunks, Sport Shorts,] Sport Shirts, and T-Shirts |
| JOCKEY | 3258066* | Jul. 3, 2007 | Nov. 23, 1934 | Underwear tops and bottoms; shorts, shirts; active wear, namely, boxer shorts, bicycle shorts, gym shorts, pants, pullovers, sport shirts, [sweat pants, sweat shirts, sweat shorts, sweat suits,] t-shirts, tank tops, jogging suits, warm-up suits; long underwear; sleepwear; nightwear; pajamas; robes; panties, bras, all-in-ones in the nature of camisoles with built in bras, camisoles, foundation garments, crop tops, stockings, tights and hosiery;[hats and clothing caps, jackets, and; clothing for infants and children, namely, hats, booties, mittens, body suits and rompers] |

| Mark | Reg./App. No. | Reg./App. Date | Date of First Use | Goods/Services |
|------|---------------|----------------|-------------------|----------------|
|      |               |                |                   |                |
| JOCKEY | 2639847* | Oct. 22, 2002 | Oct. 1981 | Retail clothing store services |

True and correct copies of these registrations are attached hereto as **Exhibit A.**

14.    Those marks denoted with an asterisk, *, in the table above have become incontestable as a matter of law under 15 U.S.C. § 1065.

15.    These trademark registrations are valid and subsisting; constitute *prima facie* evidence of Jockey's exclusive right to use the marks in interstate commerce in connection with the goods and services specified in the registrations; and serve as constructive notice of Jockey's ownership of the marks under 15 U.S.C. §§ 1057, 1072, and 1115.

16.    Jockey also owns all common law rights and interests in the marks identified in the table above (collectively, the "Jockey Image and Word Marks").

17.    Jockey has invested significant amounts of time and money to develop, promote, and maintain the Jockey Image and Word Marks in the United States. Jockey's products are sold throughout the fifty states, available at Jockey's own free-standing brick and mortar retail stores, at department, chain, and specialty stores, and online at Jockey's retail website, jockey.com, and on various third-party e-commerce sites.

18.    Jockey has invested significantly in its extensive advertisement of apparel items and its retail store services in connection with the Jockey Image and Word Marks. Jockey uses the Jockey Image and Word Marks in a variety of advertising channels, including social media, internet websites, physical billboards, ad campaigns, publications, catalogs, and other means.

19.    As a result, Jockey has achieved significant sales, exposure and recognition of Jockey's products bearing the Jockey Image and Word Marks, including unsolicited media attention.

20.    As a result of substantial sales and extensive advertising and promotion, the Jockey Image and Word Marks have become widely and favorably known as identifying apparel items originating from, sponsored by, or associated with Jockey. The public has come to associate the well-known and distinctive Jockey Image and Word Marks with Jockey as the source of high-quality apparel items sold under the Jockey Image and Word Marks and brand.

**Jockey's Opposition to Prior Application Attempt by Cooper's Company**

21.    On March 6, 2009, The Black Jockey Company, Inc., which Cooper owned at the time, filed an application to register the following mark,



, for intended use in Class 25 in connection with "Clothing, namely shoes, hats, gloves, scarves, t-shirts, jeans, undergarments, and coats."

22.    The application was published for opposition on January 26, 2010. On this same date, counsel for Jockey sent The Black Jockey Company, Inc.'s counsel a cease-and-desist letter demanding The Black Jockey Company, Inc. withdraw Application Serial No. 77685409 and cease all use of the mark; cease use of the term "BLACK JOCKEY" and the "Full Jockey Figure"; and take down its website, www.blackjockeyapparel.com. A true and correct copy of the January 26, 2010 letter is attached hereto as **Exhibit B**.

23.    On February 25, 2010, Jockey timely filed a Notice of Opposition against Application Serial No. 77685409 with the TTAB. The proceeding was

instituted under Opposition No. 91193937. The grounds for the opposition were priority and a likelihood of confusion with Opposer's marks.

24.     Jockey's counsel received a reply to its January 22, 2010 letter from The Black Jockey Company, Inc.'s counsel, dated March 3, 2010. A true and correct copy of the March 3, 2010 letter is attached hereto as **Exhibit C**.

25.     In the letter, The Black Jockey Company, Inc.'s counsel stated that BJC had "taken down its website www.blackjockeyapparel.com" and that the "words BLACK JOCKEY will not be shown separately and apart from our client's trademark, i.e., the full emblem design." The letter further stated that The Black Jockey Company, Inc. agreed "not to use the words BLACK JOCKEY and the 'Full Jockey Figure' design separate and distinct from its trademark in its entirety."

26.     The Black Jockey Company, Inc. failed to timely file an Answer to Jockey's Notice of Opposition. On August 3, 2010, the TTAB entered default judgment against The Black Jockey Company, Inc., sustaining Jockey's opposition to Application Serial No. 77685409.

27.     After default judgment was entered, Jockey continued to monitor The Black Jockey Company, Inc.'s website through December 2010 to ensure that it remained down, and that The Black Jockey Company, Inc. abided by the promises BJC's counsel had made. Through December 2010, The Black Jockey Company,

Inc.'s website remained down, and Jockey was unaware of any actions by The Black Jockey Company, Inc. that breached the terms of the promises made regarding restrictions on the use of certain terms and images. Thus, Jockey considered the matter resolved.

28.    In January 2019, Jockey discovered that The Black Jockey Company, Inc.'s owner, Cooper, had resumed use of certain terms and images in breach of the promises that had been made to Jockey in 2010, and resumed use of a website, www.blackjockeyclothing.com, in connection with the sale of goods bearing certain terms and images in breach of the promises that had been made to Jockey.

29.    Jockey had no knowledge of any actions by The Black Jockey Company, Inc. or Cooper that breached the terms of the promises made to Jockey between December 2010 and January 2019.

**Cooper's Application for the Black Jockey Mark**

30.     On April 4, 2018, Cooper filed a federal trademark application, Serial



No. 87863113, for the intended mark,                    (the "Black Jockey

Mark") on a use in commerce basis under Section (1) of the Lanham Act, 15

U.S.C. § 1051(a) in connection with "Hats; Hoodies; Jackets; Long-sleeved shirts;

Shoes; T-Shirts" in International Class 25. Cooper claimed a date of first use in

commerce of August 1, 2006.

31.     Application Serial No. 87863113 was published for opposition on

January 22, 2019, by the USPTO.

32.     On May 8, 2019, Jockey's counsel sent a cease-and-desist letter to

Cooper's counsel demanding he cease all use of the Black Jockey Mark and

abandon Application Serial No. 87863113. The letter also addressed the prior

opposition to BJC's Application Serial No. 77685409 in 2010, and the assurances

made through BJC's counsel to not use the "Full Jockey Figure" sought to be

registered in the present application. A true and correct copy of the May 8, 2019 letter is attached hereto as **Exhibit D**. No response to this letter was received.

<u>**BJC's Use of the Black Jockey Mark and Other Marks**</u>

33.    The Black Jockey Company, Inc., which was a New York corporation, was dissolved by proclamation on June 29, 2016.

34.    BJC, which is also owned by Cooper, was formed and/or registered on March 29, 2016 in the state of Georgia just before The Black Jockey Company, Inc. was dissolved.

35.    BJC operates the following website, www.blackjockeyclothing.com.

36.    On its website, BJC offers apparel items for sale that utilize the Black Jockey Mark, as well as other marks that infringe upon the Jockey Image and Word Marks. Below are screenshots of some of the apparel items BJC sells on its website that utilize infringing marks:





**The Decision of the Trademark Trial and Appeal Board in
Opposition No. 91248336**

37.     On May 22, 2019, Jockey filed a Notice of Opposition against
Application Serial No. 87863113, the Black Jockey Mark, with the TTAB. The
proceeding was instituted under Opposition No. 91248336.

38.     In its Notice of Opposition, Jockey alleged that Cooper's Black
Jockey Mark, when used in connection with the goods identified in his application,
is confusingly similar to certain Jockey marks, and would be likely to cause
consumer confusion, mistake, or deception as to affiliation, connection or
association between Jockey and Cooper, or as to origin, sponsorship, or approval of
Cooper's goods, services, or other commercial activities, in violation of Section
2(d) of the Lanham Act, 15 U.S.C. § 1052(d).

39.     The Notice of Opposition also alleged that the use and registration of
Cooper's Black Jockey Mark in connection with the goods set forth in his
application will dilute the distinctiveness of the famous Jockey marks in violation
of Section 2(c) of the Lanham Act, 15 U.S.C. § 1125(c).

40.     The Notice of Opposition also alleged that the registration of Cooper's
Black Jockey Mark is precluded by the Board's prior decision in Opposition No.
91193937.

41.     On May 14, 2021, Cooper filed a Second Amended Answer to Jockey's Notice of Opposition and Counterclaims.

42.     In his Counterclaims, Cooper alleged, among other things, that the 1960s Half Jockey Mark, the 1960s Full Jockey Mark, and the 2011 Full Jockey Mark should all be cancelled due to abandonment, and that the 2011 Full Jockey Mark, the 2011 Composite Jockey Mark, and the JOCKEY Seal Mark should be cancelled due to a likelihood of confusion with Cooper's common law Black Jockey marks.

43.     Following the denial of motions for summary judgment, the exchange of discovery, and trial testimony, the parties submitted trial briefs, and oral arguments were held before the TTAB before a three-member panel on February 22, 2024.

44.     Contrary to and in spite of the substantial evidence of record, the TTAB issued a decision on September 19, 2024, finding, among other things:

> a.     The 1960s Half Jockey Mark should be cancelled due to abandonment;
>
> b.     The 1960s Full Jockey Mark should be cancelled due to abandonment;

    c.      The 2011 Full Jockey Mark should be cancelled as to certain goods due to abandonment;

    d.      The JOCKEY Seal Mark should be cancelled because of a likelihood of confusion; and

    e.      Jockey's opposition to registration of The Black Jockey Mark was sustained because of a likelihood of confusion.

A true and correct copy of the September 19, 2024 decision of the TTAB is attached hereto as **Exhibit E**.

45.    This petition of appeal is timely per 15 U.S.C. § 1071(b).

## FIRST CAUSE OF ACTION
**(Partial Reversal of the September 19, 2024 TTAB Decision)**

46.    Jockey incorporates and realleges paragraphs 1 through 45 of this Complaint as if fully set forth herein.

47.    The September 19, 2024 decision of the TTAB is subject to de novo review under Section 21(b) of the Lanham Act, 15 U.S.C. § 1071(b).

48.    The TTAB erred in finding that the 1960s Half Jockey Mark should be cancelled due to abandonment.

49.    The TTAB erred in finding that the 1960s Full Jockey Mark should be cancelled due to abandonment.

50.    The TTAB erred in finding that the 2011 Full Jockey Mark should be cancelled as to certain goods due to abandonment.

51.    The TTAB erred in finding that the JOCKEY Seal Mark should be cancelled because of a likelihood of confusion.

52.    The TTAB's September 19, 2024 decision was contrary to the pertinent law, unsupported by substantial evidence, and therefore, insufficient to support cancellation of the 1960s Half Jockey Mark, 1960s Full Jockey Mark, the 2011 Full Jockey Mark as it relates to certain goods, and the JOCKEY Seal Mark.

53.    Jockey will introduce additional evidence of the harm that would be caused to Jockey if the TTAB decision is not reversed including, but not limited to, evidence of the fame of the JOCKEY Word Mark; the amount of advertising and marketing expenditures in support of the JOCKEY Word Mark; consumer recognition of the JOCKEY Word Mark; the likelihood of confusion from Cooper and BJC's use of the Black Jockey mark as set forth in his application; and the validity and continuous use by Jockey of the 1960s Half Jockey Mark, 1960s Full Jockey Mark, 2011 Fully Jockey Mark, and the JOCKEY Seal Mark.

54.    The TTAB's September 19, 2024 decision was contrary to pertinent law, not supported by substantial evidence and/or was in error in light of the evidence of record with the TTAB, the allegations in this Complaint, and additional

evidence to be submitted by Jockey as set forth above. Therefore, the TTAB's September 19, 2024 decision was insufficient to support the findings that the 1960s Half Jockey Mark should be cancelled due to abandonment, that the 1960s Full Jockey Mark should be cancelled due to abandonment, that the 2011 Full Jockey Mark should be cancelled as to certain goods due to abandonment, and that the JOCKEY Seal Mark should be cancelled due to a likelihood of confusion.

## SECOND CAUSE OF ACTION
### (Trademark infringement)

55.     Jockey incorporates and realleges paragraphs 1 through 54 of this Complaint as if fully set forth herein.

56.     Jockey owns the rights to the Jockey Image and Word Marks, which are valid and enforceable.

57.     Cooper has used and continues to use the Black Jockey Mark, along with other jockey-related marks, in commerce in connection with certain apparel items.

58.     BJC has used and continues to use the Black Jockey Mark, along with other jockey-related marks, in commerce in connection with certain apparel items.

59.     Cooper and BJC's use of the Black Jockey Mark, along with other jockey-related marks, in commerce as alleged herein is likely to deceive consumers

as to the origin, source, sponsorship, or affiliation of Cooper and BJC's goods, and is likely to cause consumers to believe, contrary to the fact, that Cooper and BJC's goods are sold, authorized, endorsed, or sponsored by Jockey, or that Cooper and BJC's goods are in some way affiliated with or sponsored by Jockey due to the similarities in the goods and the marks themselves.

60.     As a result, Cooper and BJC's use of the Black Jockey Mark, along with other jockey-related marks, in commerce as alleged herein infringes Jockey's registered trademarks, the Jockey Image and Word Marks, in violation of the Lanham Act § 32(1), 15 U.S.C. § 1114(1).

61.     As a direct and proximate cause of Cooper and BJC's actions alleged herein, Jockey has suffered and continues to suffer damages.

62.     Cooper and BJC's actions alleged herein have unjustly damaged Jockey's trademarks, business reputation, and the goodwill associations with Jockey's Image and Word Marks.

63.     Upon information and belief, Cooper and BJC have committed the foregoing acts of infringement with full knowledge of Jockey's prior rights in the Jockey Image and Word Marks and with the willful intent to cause confusion and trade on Jockey's goodwill, which entitles Jockey to enhanced damages and remedies set forth in 15 U.S.C. §§ 1117 and 1118.

64.    Cooper and BJC's conduct is causing immediate and irreparable harm and injury to Jockey, and to their goodwill and reputation, and will continue to damage Jockey and for which Jockey has no adequate remedy at law.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Jockey respectfully requests that the Court:

A.    Enter judgment reversing and vacating the September 19, 2024 decision of the TTAB in *Jockey International, Inc. v. Lamont D. Cooper*, Opposition No. 91248336 referenced herein, pursuant to 15 U.S.C. § 1071(b) with reference to cancellation of Jockey's marks;

B.    Sustain Opposition No. 91248336 against Cooper and in favor of Jockey as it relates to the Black Jockey Mark;

C.    Direct the Director of Trademarks to deny the registration of the Black Jockey Mark, Serial No. 87863113;

D.    Declare that the Black Jockey Mark, when used and registered in connection with the goods set forth in Cooper's Application and the goods on BJC's website, is likely to cause mistake, or to deceive the purchasing public and others as to an affiliation, connection or association between Jockey and Cooper and/or BJC, and/or as to the origin, sponsorship, or approval of Cooper and/or BJC's goods, services, or other commercial activities in violation of Section 2(d) of the Lanham Act, 15 U.S.C. § 1052(d);

E.    Declare that use and registration of the Black Jockey Mark for the goods cited in Cooper's Application and continued use by BJC on the goods on its website are likely to dilute the distinctiveness of Jockey's marks in violation of Section 2(d) of the Lanham Act, 15 U.S.C. § 1125(c);

F.      Award compensatory damages, in an amount to be determined by the trier of fact, for all harm Jockey has suffered as a result of Cooper and BJC's actions, including without limitation lost sales, revenue, or royalties, disgorgement of Cooper and/or BJC's profits, cost of corrective advertising, and other actual damages;

G.      Award treble damages pursuant to 15 U.S.C. § 1117(a) based on Cooper and BJC's knowing and intentional use of confusingly similar imitations of Jockey's Word and Image Marks;

H.      Declare that this is an exceptional case and award Jockey the cost of this action and Jockey's reasonable attorneys' fees pursuant to 15 U.S.C. § 1117(a);

I.      Award pre-judgment and post-judgment interest on the foregoing sums;

J.      Ordering a preliminary and permanent injunction prohibiting Cooper's use of the Black Jockey Mark, BJC's use of the Black Jockey Mark, and the use of any other marks by Cooper or BJC that infringe upon Jockey's Word and Image Marks;

K.      Award Jockey its attorneys' fees and costs in this action; and

L.      Award Jockey such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMAND

Jockey hereby request a trial by jury on all issues so triable.

Dated this 18th day of November, 2024.

/s/ Neil A. Bruntez
Neil A. Brunetz, GA Bar No. 090799
Matthew A. Nanninga, GA Bar No. 159070
DREW ECKL & FARNHAM, LLP
303 Peachtree Street NE, Suite 3500
Atlanta, GA 30308
Tel: (404) 885-1400
brunetzn@deflaw.com
nanningam@deflaw.com

Johanna M. Wilbert*
Nathan J. Oesch*
QUARLES & BRADY LLP
411 East Wisconsin Ave., Suite 2400
Milwaukee, WI 53202
Tel: (414) 277-5100
johanna.wilbert@quarles.com
nathan.oesch@quarles.com
*pro hac vice forthcoming

Attorneys for Plaintiff –
Jockey International, Inc.

## CERTIFICATE OF COMPLIANCE

Counsel for Defendant hereby certifies that the forgoing has been prepared with one of the font and point selections approved by the Court in LR 5.1(C): Times New Roman (14 point).

This 18th day of November, 2024.

/s/ Neil A. Bruntez
Neil A. Brunetz, GA Bar No. 090799
Matthew A. Nanninga, GA Bar No. 159070
DREW ECKL & FARNHAM, LLP
303 Peachtree Street NE, Suite 3500
Atlanta, GA 30308
Tel: (404) 885-1400
brunetzn@deflaw.com
nanningam@deflaw.com

Johanna M. Wilbert*
Nathan J. Oesch*
QUARLES & BRADY LLP
411 East Wisconsin Ave., Suite 2400
Milwaukee, WI 53202
Tel: (414) 277-5100
johanna.wilbert@quarles.com
nathan.oesch@quarles.com
*pro hac vice forthcoming

Attorneys for Plaintiff –
Jockey International, Inc.